MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2013 ME 74
Docket:        Yor-11-440
Argued:        May 15, 2013
Decided:       August 6, 2013

Panel:         SAUFLEY, C.J., and SILVER, MEAD, GORMAN, and JABAR, JJ.

## STATE OF MAINE

v.

## JASON TWARDUS

SILVER, J.

[¶1] Jason Twardus appeals from a decision of the trial court (*Brennan, J.*) denying his two motions for a new trial following his conviction of murder, 17-A M.R.S. § 201(1)(A) (2012), after a jury trial. Twardus argues that the court erred and abused its discretion in concluding that neither the State's alleged failures to disclose evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), nor the discovery of new evidence after trial pursuant to M.R. Crim. P. 33, entitled Twardus to a new trial. We affirm the judgment.

## I. BACKGROUND

A.    Factual Background

[¶2] Sometime between the night of August 7, 2007, and the morning of August 8, 2007, the victim disappeared. The victim, who was thirty years old at the time of her disappearance, was last seen on the night of August 7 at her

2

apartment in Alfred. Nearly a month later, on September 2, 2007, the victim's body was found buried in Stewartstown, New Hampshire, on property belonging to Twardus's father.

[¶3] Twardus, who was twenty-six years old at the time of the victim's disappearance, had been in a romantic relationship with the victim on and off since 2005. In 2006, Twardus moved in with the victim at her apartment, which was located on the property of John and Nancy Durfee in Alfred. That October, Twardus and the victim were engaged to be married. The couple discussed a wedding date of August 4, 2007. In January 2007, however, the victim broke off the engagement. The two continued to live together until June 2007, when the victim asked Twardus to move out. Twardus moved in with his father in Rochester, New Hampshire. Twardus and the victim continued to speak on the phone and go biking together.

[¶4] In late July, however, the victim began a romantic relationship with Calvin Degreenia, who had just moved into another apartment on the Durfee property where the victim lived. Degreenia had met John Durfee in prison, and took a job with Durfee's paving company upon his release. Degreenia and the victim began spending time together and became intimate. On the night of August 7, 2007, the victim, Degreenia, and Durfee had a cookout and drinks

together on the Durfee property. That night was the last time the victim was seen alive.[1]

[¶5] The victim did not go to work the following day, August 8, nor did she call to explain her absence. Because this was out of character for the victim, her supervisor became concerned and called the police that night, and called the victim's mother the following morning. The victim's mother also became concerned because she regularly spoke with her daughter, and could not reach her on the phone. On the morning of August 9, the victim's mother went to her daughter's apartment in Alfred. When the victim did not answer the door, her mother unlocked the door using her spare key and went inside. There was no sign of the victim, but her keys were on the kitchen table and her car was outside. The victim's four dogs, which she cared for regularly, had defecated inside the apartment. There were no signs of a struggle or forced entry. The victim's mother called the police. She also called Twardus to ask if he had heard from the victim. At the request of the victim's mother, Twardus called the victim and left a voicemail. He never called the victim again, despite having called her many times in the weeks leading up to her disappearance.

---

[1] Degreenia and another worker on Durfee's paving crew told police shortly after the victim's disappearance that they saw her get into a red car on the evening of Wednesday, August 8. At trial, however, they testified that they no longer believed that the woman they saw was the victim, but rather Durfee's niece or someone who had come to ride, look at, or train the Durfees' horses. The clothes they described the woman as wearing did not match those found on the victim's body.

[¶6] The police first interviewed Twardus in connection with the victim's disappearance on August 11, 2007. Asked when he had last come to Maine, Twardus told police that on the night of Monday, August 6, 2007, he had gone fishing at Biddeford Pool. He said that he had arrived at Biddeford Pool late on Monday night because he wanted to fish at high tide and that he had fished for several hours and arrived home in Rochester early in the morning of Tuesday, August 7, 2007. Tide charts admitted at trial showed that it was low tide around the time that Twardus said he had arrived, not high tide. Twardus also told the police that he had called in sick Tuesday, slept all day, and did not go out at all.

[¶7] Following that interview, however, police learned that Twardus's car had been seen in the vicinity of the victim's apartment on Monday, August 6. A resident had called the police that night at 9:12 p.m. to report an unfamiliar vehicle parked near her home, a short distance from the victim's apartment. An officer responded to the call at 9:41 p.m., and found a green 1997 Subaru Impreza parked on the side of the road. Not seeing any operator nearby, the officer ran the car's plates and discovered that it was registered to Twardus. One of the more distinctive features of the car was that it did not have a passenger-side mirror.

[¶8] Police again interviewed Twardus and asked if he had made any stops on his way to Biddeford Pool on the night of August 6. Twardus replied that he had stopped at a store to buy a drink, but did not recall stopping anywhere else.

When police asked if there was any reason that someone would have reported seeing his vehicle, Twardus admitted that he had stopped in Alfred, near the victim's apartment, to urinate in a wooded area off of the road. When police later questioned this story, Twardus claimed that he was also smoking marijuana. At trial, however, several of Twardus's friends testified that he did not smoke marijuana. Twardus also claimed in his first several interviews with police that he had been at home on the following night, August 7. Later, he told police that he had in fact gone fishing the night of August 7 at Rye Beach, and arrived home early the next morning.

[¶9] On August 30, 2007, with the victim still missing, police executed a search warrant for the home of Twardus and his father in Rochester and for Twardus's green Subaru. A human head hair, later determined to be the victim's, was found in Twardus's trunk. Police also learned that Twardus's father owned property in Stewartstown, New Hampshire, some 160 miles north of Rochester. Twardus had been to the Stewartstown property in the past, including a camping trip with the victim in 2005.

[¶10] On September 1, police proceeded to the Stewartstown property. With some difficulty and the aid of a tax map, they managed to locate the unmarked Twardus lot, which has no street address and is located in a remote area where many roads are unmarked. There, they discovered an area of recently

6

disturbed earth covered with branches. Police returned to the property the following day with a search warrant and excavated the disturbed ground. Not far below the surface, they discovered the victim's body, barefoot and wrapped in a comforter. Nancy Durfee later identified the comforter as having come from the victim's apartment.[2]

[¶11] Buried along with the victim's body, police found three pairs of women's underwear, a bra, a bag that the victim used as a purse, the SIM card to the victim's cell phone, and a shoebox full of photographs belonging to the victim's sister. Inside the shoebox, police also discovered a plastic baggie containing several family photographs taken around Christmas 2006, including a photograph of the victim and Twardus. Twardus's fingerprints were found on the baggie and one of the photographs inside it. Also found in the grave was a plastic baggie containing a white powder, later identified as crushed tablets of the prescription medication Requip.[3] Twardus's father took Requip for restless leg syndrome at that time, and had a bottle of it in his medicine cabinet in Rochester. An autopsy of the victim's body was performed, and the cause of her death was

---

[2] A shoeprint on the comforter could not be matched to any of the shoes seized by police, including several pairs seized from Twardus.

[3] DNA testing performed on the plastic baggie revealed a mixture of DNA from at least two people, at least one being male. The victim, Twardus, Twardus's father, Durfee, Degreenia, and another Durfee employee were excluded as sources of the DNA.

determined to be strangulation. A sample of blood taken from the victim's body did not indicate the presence of Requip.

[¶12]   Twardus had told police that he was at home during the day of August 8, or that he only went out to get a haircut. Twardus's father saw his son in bed at their home in Rochester when he left for work that day at 6:10 or 6:15 a.m. But shortly thereafter, at 7:06 a.m., Twardus was filmed at a drive-through ATM in Rochester. Bank records showed that Twardus withdrew $100 in cash, which appeared to be unusual for Twardus, as he generally used his debit card, even for small purchases. Twardus was wearing an orange hooded sweatshirt, and there was an object on the passenger seat next to him. Several witnesses later identified the object as a two-tone Myrtle Beach hat that Twardus bought on a trip with the victim. Twardus testified at trial that he did not know what the object was, and that it could be a crumpled paper bag.

[¶13]   After the discovery of the victim's body, police visited a Big Apple convenience store in Colebrook, New Hampshire, seven miles from the burial site, and obtained the store's security camera footage for August 8, 2007.[4] The black and white footage showed a car pull in from the direction of Stewartstown around noon. The car appeared to lack a passenger-side mirror. The driver of the vehicle,

---

[4]   The jury viewed the security camera footage, and still images from the footage were admitted in evidence.

a male, entered the store, wearing what appeared to be a hooded sweatshirt and a two-tone hat. Several witnesses, including some of Twardus's friends and coworkers, would later identify the man in the Big Apple footage as Twardus, although other witnesses said the images were too unclear to make a positive identification of the man or the car.

B.      Procedural History

1.      The Trial

[¶14]  Twardus was indicted for the victim's murder in January 2009, and a three-week jury trial was held in September 2010.  The State's theory of the case was that Twardus was obsessed with the victim, and after stalking her and potentially learning of her new relationship with Degreenia, he strangled her at or near her apartment in Alfred on the night of August 7 or the morning of August 8. Twardus then placed the victim's body in the trunk of his car, and drove home to Rochester.  After his father left for work, Twardus went to the ATM and withdrew cash, knowing that purchases with his debit card would reveal his location. Twardus then drove to his father's property in Stewartstown, New Hampshire, buried the victim's body, and stopped at the Big Apple convenience store in Colebrook on his way back to Rochester.

[¶15]  The defense challenged the State's theory on the grounds that there was insufficient evidence that the victim's murder occurred in Maine, and by

positing alternative suspects, primarily Durfee and Degreenia.[5] The defense vigorously impeached both Durfee and Degreenia, in part based upon their criminal records. Evidence was also presented as to Durfee's use of the drug PCP, erratic behavior, and crude and sexually aggressive behavior towards women.[6] The State, however, presented evidence that Durfee and Degreenia's cell phones were connecting to cell towers in southern Maine, southern New Hampshire, or Massachusetts during the critical period of August 7 through August 15, 2007, which tended to show that they could not have been burying the victim's body in northern New Hampshire. In addition, both Durfee and Degreenia denied knowledge of the Twardus property in Stewartstown. The State also presented evidence that Twardus was the only one who would have had access to the shoebox of photos and the drug Requip found in the victim's grave. Twardus testified. He denied any involvement in the victim's disappearance and murder, or that he was in Stewartstown or Colebrook on August 8.

[¶16] On October 1, 2010, the jury found Twardus guilty of the victim's murder. On August 16, 2011, Twardus was sentenced to the Department of Corrections for a term of thirty-eight years.

---

[5] Another Durfee employee was also posited as a possible suspect or accomplice.

[6] The defense attempted to suggest that Durfee had some kind of sexual relationship with the victim. Durfee denied any such relationship and testified that the medication he took for his heart condition had rendered him impotent.

10

## 2. First Motion for a New Trial

[¶17] On January 10, 2011, Twardus filed his first motion for a new trial. Evidentiary hearings on that motion were conducted on April 14 and June 22, 2011. Charity Camire, an employee of Maine Pretrial Services, testified that John Durfee had told her, while the victim was still missing, that one of the victim's ex-boyfriends had parents with land in New Hampshire, and that he "bet that that's where they would find her." When asked whether Durfee had said that the land was in upstate New Hampshire, Camire testified that she believed Durfee said either northern or upstate New Hampshire. Camire further testified that she called the state police the same day, and spoke to Detective Michael Zabarsky, the lead investigator in the victim's case, or possibly another detective of the state police.[7] When she related what Durfee had said, the detective sounded uninterested, and told her that he was "well aware" of or "very familiar" with Durfee. Zabarsky testified that he had no memory or record of speaking with Camire. No information regarding Durfee's alleged statements was relayed to the prosecutor or disclosed to the defense.

[¶18] Twardus also called Elaine Plourde, a York County corrections officer, who testified that while Durfee was in jail in August 2007, with the victim

---

[7] Initially, Camire could not recall the name of the detective she spoke to, but she testified that he had identified himself as the lead investigator in the victim's case. She later testified that she had located notes that appeared to indicate that she had spoken to Zabarsky, and recalled speaking with someone who identified himself as Zabarsky.

still missing, Durfee made a series of statements, including that he "knew where the burial ground was." According to Plourde, Durfee did not specify a location or refer to the victim, specifically. She also testified that he appeared to be under the influence of drugs, was "ranting and raving" and "going off on a tangent," and said that there were "aliens flying in his cell." Plourde did not report the incident to the police, because Durfee "was clearly not in the right state of mind." Durfee denied making the burial ground comment. Another witness, Geneva Hersom, testified that she overheard Plourde say in October 2010 that Durfee had whispered to her that he knew where the victim's body was. Plourde denied making such a statement.

[¶19] Twardus also called Nancy Durfee. On October 13, 2010, Nancy Durfee was found unconscious on a roadside in Eliot. She was transported to the hospital, and laboratory tests indicated the presence of PCP in her system. At trial, Nancy Durfee had testified that her husband used PCP, but that she did not like to be around it. At the motion hearing, she maintained that the test results must have been due to secondhand smoke.

[¶20] Nancy Durfee initially told authorities that she had been with her husband on October 13, and that he had been driving. She also told medical personnel that she had been having an argument with her husband. At the hearing, however, both she and her husband maintained that he was not driving the car.

12

Rather, she testified that she had been approached by a homeless man for a ride to Alfred, and decided to let the man drive her car. Once they started to drive back to Alfred, however, she became uncomfortable and asked that the man pull over and let her out to use a restroom. She asked the man to take the car back to Alfred, and was going to call her daughter for a ride, but she left her purse and cell phone in the vehicle. Nancy Durfee testified that she did not remember what happened after she exited the car, due to a concussion, but that she must have fallen.

[¶21] Later, in a separate incident on March 10, 2011, the Durfees were both arrested on drug charges when PCP was found in their car. Ultimately, the state elected not to prosecute Nancy Durfee.

[¶22] On July 18, 2011, the court denied Twardus's motion. The court concluded that it was unlikely that much of the newly discovered evidence about the Durfees, if presented to the jury at trial, would have resulted in a different verdict because his credibility as a trial witness had already been substantially undermined and because her role as a witness was not a critical part of the State's case. Camire's testimony, however, presented a "closer question" because it had to be considered "in light of the less stringent standard applied" when there has been a *Brady* violation. Even viewing Camire's testimony under the *Brady* standard, however, the court determined that there was no reasonable probability that this

undisclosed evidence would have resulted in a different verdict, and that it did not undermine confidence in the jury's verdict.

3. Second Motion for a New Trial

[¶23] On January 5, 2012, Twardus filed a second motion for a new trial. Evidentiary hearings were conducted on April 30, May 11, and May 25, 2012.

[¶24] The testimony on the second motion showed that, while Twardus's first motion for a new trial was pending, the State received notice that an inmate at York County Jail named Kenneth Villella wanted to speak to law enforcement regarding John Durfee. On June 21, 2011, Sergeant Christopher Harriman of the state police directed Trooper Lauren Edstrom to speak with Villella. Villella told Edstrom that he was Durfee's cellmate, and that Durfee had stated that he "knows how to bury people," and that if anything happened to Villella, "we can put them in a shallow grave." Villella also said that Durfee called the victim a "pig" and a "slut." The interview terminated with Villella saying that he wanted to be treated fairly in his pending case, and had nothing further to say until he spoke with his lawyer.

[¶25] That same day, Edstrom orally reported the substance of her interview with Villella to Harriman, and Harriman orally relayed that information to the prosecutor. The prosecutor received Edstrom's written report summarizing the interview on October 17, 2011, and mailed it to the defense on October 21, 2011,

14

by which time the court had denied Twardus's first motion for a new trial and sentenced Twardus. The defense was not otherwise informed of Villella's statements. In the meantime, in August 2011, Durfee had died.

[¶26] In August 2011, after the first Villella interview but before the report summarizing the first interview had been prepared and transmitted to the defense, Villella indicated that he wanted to speak with the state police again. Zabarsky interviewed Villella on October 5, 2011. During that interview, Villella reported that Durfee had said that he could "make people disappear," that he helped "put the body where it was," that "somebody else put the body there," that he "didn't put the body there, he had help," that "[s]he deserved it," that Twardus was an "idiot" and a "punk," that the comforter in which the body had been wrapped belonged to one of Durfee's daughters, and that "they partied one night." Villella also said that Durfee called the victim a "slut," but acknowledged that Durfee referred to all women in such terms. The prosecutor was informed of the substance of the second interview shortly after it was conducted, received Zabarsky's report and a recording of the interview on December 6, 2011, and forwarded the report and recording to the defense on December 8, 2011. The prosecutor, Zabarsky, and Harriman all testified that the delay in the preparation of the reports and their transmission to the prosecutor was not unusual.

[¶27]   At the hearings on his second motion, Twardus also presented evidence that, in January 2012, after Twardus's conviction, Degreenia had pled guilty in New Hampshire to felony domestic violence assault on his then-girlfriend.  The conviction was based on an incident in March 2011, in which Degreenia choked his girlfriend for several seconds.  As part of Degreenia's sentence, he was ordered to complete a batterers' intervention program.  Degreenia and his girlfriend were married the day of his release.  The State first learned of the charges against Degreenia from Twardus's attorneys in August 2011, and declined their request that the State procure the relevant records, noting that they knew of the conviction before the State did and had equal access to the records.

[¶28]   On November 29, 2012, the court denied Twardus's second motion for a new trial.  The court found that Twardus had not established a violation of the requirements of *Brady* or of his due process rights, and therefore applied the more stringent Rule 33 analysis for newly discovered evidence.  Although it recognized that the statements Villella attributed to Durfee were of potential exculpatory value to Twardus, the court noted that Twardus presented those statements through the testimony of Edstrom and Zabarsky; Villella did not testify at the hearing.  Without being able to observe Villella testify, the court concluded that the officers' hearsay statements of what Durfee said to Villella did not warrant a new trial.  With respect to Degreenia's assault conviction, the court concluded that it would not probably

change the trial result, as only the fact of Degreenia's conviction would be admissible at a new trial, and Degreenia had already been impeached on the basis of his prior felony convictions at trial.

## II. DISCUSSION

A. Legal Standards and Standards of Review

1. Maine Rule of Criminal Procedure 33

[¶29] When reviewing the denial of a motion for a new trial pursuant to M.R. Crim. P. 33 on the basis of newly discovered evidence, we review the court's findings of fact for clear error and its determination of whether the defendant has met the necessary elements for an abuse of discretion. *State v. Cookson*, 2003 ME 136, ¶ 28, 837 A.2d 101; *see also State v. Sheldon*, 2000 ME 193, ¶ 7, 760 A.2d 1083 (stating that the ultimate decision on a motion for a new trial involves mixed questions of law and fact and is reviewed for an abuse of discretion.) Motions for a new trial on the ground of newly discovered evidence are looked upon with "disfavor," in light of "the need for finality and for the preservation of the integrity of criminal judgments." *Cookson*, 2003 ME 136, ¶ 28, 837 A.2d 101 (citing *State v. Ardolino*, 1999 ME 14, ¶ 8, 723 A.2d 870). Pursuant to our precedents, a defendant seeking a new trial based on newly discovered evidence must establish by clear and convincing evidence that

(1) the evidence is such as will probably change the result if a new trial is granted;

(2) it has been discovered since the trial;

(3) it could not have been discovered before the trial by the exercise of due diligence;

(4) it is material to the issue; and

(5) it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

*Id.* ¶ 29 (quoting *Ardolino*, 1999 ME 14, ¶ 8, 723 A.2d 870). "The trial court determines both the weight and the credibility to be attached to the newly discovered evidence." *State v. Dechaine*, 630 A.2d 234, 236 (Me. 1993).

[¶30] As we have explained, the defendant's burden in seeking a new trial based on newly discovered evidence is a heavy one:

It is not enough for the defendant to show that there is a possibility or a chance of a different verdict. [I]t must be made to appear that, in light of the overall testimony, new and old, another jury *ought* to give a different verdict; there must be a *probability* that a new trial would result in a different verdict.

*Id.* (alteration in original) (quotation marks omitted). Where the newly discovered evidence is merely impeaching, the standard is even higher, as we have required a showing of a "nearly certain change in result." *State v. Melanson*, 566 A.2d 83, 85 (Me. 1989); *see also State v. Heald*, 395 A.2d 457, 458 (Me. 1978) (requiring a "*clear*" showing that new impeachment evidence would produce a different verdict).

18

## 2. *Brady v. Maryland*

[¶31]   A somewhat less stringent standard applies, however, where a defendant alleges a violation of the State's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).   The U.S. Supreme Court has described the *Brady* rule as follows:

> In *Brady*, this Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.  We have since held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence. Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.   Moreover, the rule encompasses evidence known only to police investigators and not to the prosecutor.   In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in [a] case, including the police.

*Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (citations and quotation marks omitted).  The protections of *Brady* stem from the requirement of due process and the right to a fair trial.[8]   *United States v. Bagley*, 473 U.S. 667, 675 (1985). Because *Brady* is a trial right, its requirements do not apply after conviction.  *See Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 68-69 (2009) (stating that "*Brady*

---

[8]   The State also has disclosure obligations pursuant to M.R. Crim. P. 16.  *See State v. Carr*, 2012 ME 136, ¶¶ 8-10, 58 A.3d 1102; *State v. Gould*, 2012 ME 60, ¶¶ 22, 24-27, 43 A.3d 952.

is the wrong framework" in the post-conviction context). Where *Brady* does not apply, a defendant is "left with an argument that the prosecutor's non-disclosure amounted to conduct contrary to fundamental notions of fair play and that defendant was thereby deprived of a fair trial." *State v. Whitten*, 499 A.2d 161, 162-63 (Me. 1985).

[¶32] The Supreme Court has identified three elements of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. The element of prejudice is satisfied if the undisclosed evidence is material—that is, "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *See id.* (equating prejudice element with materiality inquiry); *see also State v. Silva*, 2012 ME 120, ¶ 10, 56 A.3d 1230 ("Evidence is material when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." (quotation marks omitted)). A "reasonable probability" of a different result exists where "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quotation marks omitted); *see also Bagley*, 473 U.S. at 682 ("A 'reasonable probability' is a probability sufficient to

undermine confidence in the outcome."); *State v. Harnish*, 560 A.2d 5, 7 (Me. 1989) (applying *Bagley* formulation of the materiality analysis). The materiality of undisclosed evidence is considered collectively. *Kyles*, 514 U.S. at 436 & n.10. The defendant retains the burden of proof, *see Strickler,* 527 U.S. at 296, and the denial of a motion for a new trial based upon alleged *Brady* violations is reviewed for an abuse of discretion, *see United States v. Connolly*, 504 F.3d 206, 211-12, 219 (1st Cir. 2007).

[¶33] The Supreme Court has cautioned that the materiality inquiry is not a simple preponderance standard or a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Materiality, the Court has stated,

> is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Strickler*, 527 U.S. at 290 (citations and quotation marks omitted). Put another way, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434; *see also Smith v. Cain*, 132 S. Ct. 627, 630 (2012) ("A reasonable probability does not mean that the defendant would more

likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine[] confidence in the outcome of the trial." (alteration in original) (quotation marks omitted)).

B.    Analysis

1.    Charity Camire and Michael Zabarsky's Testimony

[¶34]   The trial court found Camire "entirely credible," and found that Durfee had made the August 2007 statements she attributed to him, that Camire had promptly passed that information on to the state police, and that neither the prosecutor nor Twardus had been informed of this information.  Applying the *Brady* standard, the court found that the information had impeachment and possible exculpatory value, and was at least inadvertently withheld.  The parties do not appear to contest these findings, and they are supported by the record.  The question is therefore whether "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," *Strickler*, 527 U.S. at 281, where a "reasonable probability" means a "probability sufficient to undermine confidence in the outcome," *Bagley*, 473 U.S. at 682.

[¶35]   At trial, the jury was presented with evidence that Durfee believed that the victim was dead even before her body was found.  Specifically, the evidence showed that Durfee was talking to someone about renting the victim's

22

apartment while she was still missing, and, when confronted about that fact by police, said "She ain't coming back, believe me." Durfee testified that he believed the victim was never coming back because before her disappearance, he saw her every day. On that point, therefore, Camire's testimony would have been cumulative. Camire's testimony, however, would have contradicted Durfee's denial at trial that he knew of Twardus's father's property in Stewartstown, and thereby bolstered Twardus's suggestion that Durfee was responsible for the victim's death.

[¶36] Even if a jury were presented with the undisclosed evidence at a new trial, however, the evidence of Twardus's guilt remains highly compelling, as does the evidence tending to exculpate Durfee. Perhaps most importantly, the State presented evidence that Durfee's cell phone was connecting to cell towers in southern Maine, southern New Hampshire, or Massachusetts during the critical period of early August 2007, suggesting that he was not near the Stewartstown property during that critical period.[9]

[¶37] The evidence also showed that the Stewartstown property on which the victim was found was an unmarked lot with no street address in an area with many unmarked streets. The property proved difficult for police to find, even with

---

[9] The evidence showed that John Durfee sometimes used his wife's cell phone, but Nancy Durfee testified that she had her phone with her on August 8. Even if the jury did not credit Nancy Durfee's testimony, one of Twardus's own witnesses placed John Durfee in Alfred on the morning of August 8.

the aid of a tax map. Additionally, the evidence showed that only Twardus would have had access to the shoebox of photos found in the victim's grave, and that Twardus's fingerprints were on a photograph and plastic bag inside the box. Finally, a baggie of a prescription medication, Requip, which Twardus's father took, was also found in the grave, and one of the victim's head hairs was found in the trunk of Twardus's car.

[¶38] The evidence showed that the victim had broken off her engagement to Twardus, and that she disappeared two months after Twardus moved out of her apartment and just a few days after their planned wedding date. Twardus had called the victim many times in the weeks leading up to her disappearance, but after an August 9 call made at the request of the victim's mother, he never called the victim again.

[¶39] The evidence also showed that Twardus gave police inconsistent reports of his whereabouts during the week of the victim's disappearance. Critically, Twardus initially omitted that he was in the vicinity of the victim's apartment on the night of August 6, the night before her disappearance. He also initially claimed to be at home during the day of August 8, or that he only went out to get a haircut, but he was filmed withdrawing cash from an ATM that morning. Several of Twardus's friends and coworkers identified Twardus in images from a

Big Apple convenience store security camera footage taken later that day, several miles from the burial site and over a hundred miles from Twardus's home.

[¶40] Twardus testified, denying that he killed the victim or that he was the person in the Big Apple footage. The jury had a chance to evaluate his credibility. Obviously, the jury did not believe Twardus's testimony. Although Camire's testimony could have bolstered Twardus's theory of defense, that theory remains incompatible with the weight of the evidence. The court therefore did not err or abuse its discretion in concluding that, in light of all of the evidence, the undisclosed evidence does not undermine confidence in the jury's verdict. *See Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682.

2.      Elaine Plourde and Geneva Hersom's Testimony

[¶41] Because Plourde did not report the statements she attributed to Durfee to an agent of the State, the Rule 33 standard controls. *See Strickler*, 527 U.S. at 281-82 (setting forth elements of *Brady* violation). To the extent it might be admissible substantively at a new trial, Plourde's testimony, like Camire's, would lend some support to Twardus's theory of defense, in that Durfee's alleged "burial ground" comment could support the inference that Durfee knew that the victim was dead and had been buried while she remained missing. But given the vagueness of Durfee's alleged statements, the fact that Durfee made the statements while "ranting and raving" about "aliens flying in his cell," and the compelling

evidence of Twardus's guilt, Plourde's testimony would be of limited probative value and unlikely to result in a different verdict. *See Dechaine*, 630 A.2d at 236 (noting defendant's burden to show that "another jury *ought* to give a different verdict" in light of new evidence (quotation marks omitted)).

[¶42]  To the extent that Plourde's testimony would be admissible solely to impeach Durfee, who denied making the "burial ground" comment, Twardus must make a clear showing that the impeachment evidence would have resulted in a different verdict. *See Cookson*, 2003 ME 136, ¶ 29, 837 A.2d 101.  Durfee was thoroughly impeached at trial, in part based upon his drug use, criminal record, lack of memory, and inconsistent statements.  At one point in the trial, defense counsel asked Durfee, "Do you say just sort of anything that comes into your mind when somebody asks you about things that happened?"  Durfee replied: "Probably."  As the trial court concluded, because the jury was highly unlikely to credit Durfee's testimony, further impeachment based on post-trial events could have little appreciable effect on the jury's assessment of him.  Hersom's testimony was offered solely to impeach Plourde, Twardus's own witness; it would be inadmissible hearsay if offered to prove what Durfee said to Plourde. M.R. Evid. 801, 802, 805.

### 3.     John and Nancy Durfee's Testimony

[¶43]  The testimony of John and Nancy Durfee as to post-trial events, to the extent it is admissible, *see* M.R. Evid. 608(b)(1), would be admissible only to impeach the Durfees.  As discussed above, further impeachment of John Durfee would have been cumulative.

[¶44]  As to Nancy Durfee, the trial court aptly described her testimony at the motion hearing as "fantastical."  The discrepancies between her initial statements when she was found unconscious on the side of the road and her later story that she had let a homeless man take her car, in addition to her continued insistence that she had never done PCP despite evidence to the contrary, would likely seriously undermine her credibility in the eyes of a jury.

[¶45]  For the most part, however, the State's case did not hinge on Nancy Durfee's testimony.  The State did not call her as part of its case-in-chief.  She did identify the comforter in which the victim's body was wrapped as coming from the victim's apartment, as first elicited by Twardus on direct examination.  The State referenced the comforter in its closing argument on the issue of jurisdiction, which was an issue at trial given that the victim's body was found in New Hampshire.  But the State's argument that the victim was killed in Maine also rested on the narrow window of time in which Twardus could have murdered her on the night of August 7 or early morning of August 8, and the evidence that the victim was not

with Twardus when he was seen at his home in Rochester early on August 8, nor in the footage from the ATM later that morning. The evidence also showed that the victim was found barefoot and her keys were locked inside her apartment, which supports the inference that she did not leave her Alfred apartment, where she was last seen alive, willingly. That one of the victim's hairs was found in Twardus's trunk was also consistent with the State's theory. In light of the particularly high standard applicable to newly discovered impeachment evidence, *see Cookson*, 2003 ME 136, ¶ 29, 837 A.2d 101; *Melanson*, 566 A.2d at 85, the trial court did not err or abuse its discretion in concluding that the new evidence would not have changed the outcome of the trial.

4.    Kenneth Villella's Statements

[¶46]  Twardus asserts that the State's delay in disclosing the existence of Villella and his statements about Durfee amounts to a violation of the State's *Brady* obligations. *Brady*, however, protects defendants' right to a fair trial, and does not apply to evidence that did not exist at the time of trial. *See Osborne*, 557 U.S. at 68-69; *Strickler*, 527 U.S. at 281-82; *Bagley*, 473 U.S. at 675. Because *Brady* does not apply, Twardus is "left with an argument that the prosecutor's non-disclosure amounted to conduct contrary to fundamental notions of fair play and that [he] was thereby deprived of a fair trial." *Whitten*, 499 A.2d at 162-63. To the extent that Twardus's brief can be read to raise such a general due process

claim on appeal, we find no error in the court's determination that the State's delay in disclosing Villella's statements did not amount to a violation of Twardus's due process rights.

[¶47] Applying the Rule 33 standard for newly discovered evidence, Twardus has not shown a probability of a different verdict for the simple reason that Villella did not testify. Rather, his hearsay statements as to what Durfee said to him in jail were presented at the hearing through the testimony of Edstrom and Zabarsky. There is no indication that the double-hearsay testimony of Edstrom and Zabarsky as to what Villella claims that Durfee said would be admissible at trial. *See* M.R. Evid. 801, 802, 805. Moreover, as the trial court pointed out, without observing Villella testify, the court was "left to speculate about what [Villella] might say, or how credible he would be and what effect it might have at a new trial." Twardus has therefore not shown that "another jury *ought* to give a different verdict" in light of the new evidence. *See Dechaine*, 630 A.2d at 236 (quotation marks omitted); *see also Cookson*, 2003 ME 136, ¶ 29, 837 A.2d 101.

5. Calvin Degreenia's Subsequent Conviction

[¶48] The evidence at the motion hearing supports the trial court's conclusion that Degreenia's post-trial assault charges in New Hampshire were first brought to the State's attention by Twardus. As such, Rule 33, rather than *Brady*, provides the relevant standard. *See Strickler*, 527 U.S. at 281-82 (identifying

suppression by the State as an element of a *Brady* violation). As the trial court noted, Degreenia's assault conviction would be admissible at a new trial only for purposes of impeachment pursuant to M.R. Evid. 609, not as substantive evidence. *See* M.R. Evid. 404(b). Critically, only the *fact* of Degreenia's conviction would be admissible, not the circumstances underlying the conviction. *See* M.R. Evid. 609; *State v. Carmichael*, 395 A.2d 826, 827-28 (Me. 1978). Because Degreenia was already impeached with multiple convictions at trial, it is not likely, much less "clear," that further impeachment of Degreenia along those lines would result in a different verdict. *Cookson*, 2003 ME 136, ¶ 29, 837 A.2d 101 (requiring a "clear" showing that impeachment evidence would have resulted in a different verdict).

[¶49] Twardus also suggests that Degreenia's conviction or the underlying facts leading to the conviction would be admissible for impeachment purposes because John Durfee characterized Degreenia as gentle. This evidence, however, would only have impeachment value as to Durfee, who was already thoroughly impeached at trial. Assuming that this evidence would be admissible at a new trial, it is far from clear that further impeachment of Durfee would change the outcome of the trial.

30

C.    Conclusion

[¶50]   The trial court did not err or abuse its discretion in concluding that nothing presented in support of Twardus's two motions for a new trial, considered cumulatively, would probably result in a different verdict or create a reasonable probability of a different result, so as to undermine confidence in the jury's verdict. To the extent that the newly discovered evidence would be admissible at a new trial, it consists primarily of impeachment evidence that is cumulative of the evidence the jury heard at trial or concerns a witness not critical to the State's case. With respect to the lone *Brady* issue, the undisclosed evidence, although helpful to Twardus, does not undermine confidence in the jury's verdict in light of the considerable evidence presented at trial and apparently accepted by the jury that Twardus, and only Twardus, could have committed the crime.

The entry is:

Judgment affirmed.

_____

**On the briefs:**

Daniel G. Lilley, Esq., and Tina Heather Nadeau, Esq., Daniel G. Lilley Law Offices, P.A., Portland, for appellant Jason Twardus

Janet T. Mills, Attorney General, and William R. Stokes, Dep. Atty. Gen., Office of Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Daniel G. Lilley, Esq. for appellant Jason Twardus

William R. Stokes, Dep. Atty. Gen., for appellee State of Maine

York County Superior Court docket number CR-2009-77
FOR CLERK REFERENCE ONLY