STATE OF MAINE                          UNIFIED CRIMINAL DOCKET
AROOSTOOK,ss                            DOCKET NO. AROCD-CR-18-30028


STATE OF MAINE            )
                          )
                          )
                          )
                          )
vs.                       )              ORDER AND DECISION
                          )                 REGARDING
                          )              MOTION FOR NEW TRIAL
                          )
JAMES PEASLEE             )
        Defendant         )


Before the court is Defendant, James Peaslee's, Motion for New Trial brought

pursuant to M.R.U.Crim. P. 33. By an Indictment dated February 8, 2018, Peaslee

was charged with the intentional or knowing murder of Paul Hilenski, 17-A,

M.R.S. 201(1)(A). Trail was held in June, 2019, and on June 11, 2019 the jury

returned a verdict of guilty. Following trial, the State provided additional discovery

to Peaslee which included a statement made by Stephanie Vierkant to a detective

of the Maine State Police in which she reported an interaction with George

Peaslee, Peaslee's brother with a similar appearance. According to the motion, in

her statement, Vierkant told the detective that "George arrived crying and

hysterical stating he was the one who actually killed the stepfather, because of all

the abuse he and James had taken at the hands of his stepfather." Based upon the

additional discovery, Peaslee moves for a new trial.

1

An evidentiary hearing on Peaslee's motion was held November 12, 2019. At hearing, testimony was received from Dr. Daniel Bannish, Clinical Director at the Maine State Prison, Intensive Mental Health Unit (hereafter IMHU), Stephanie Vierkant, Det. Lawrence Anderson of the Maine State Police, and Lt. Troy Gardner of the Maine State Police. Also received in evidence as Exhibit 1 is the video recording of the interview of George Peaslee conducted by Det. Anderson on January 18, 2018, less than 24 hours after the shooting of Paul Hilenski. From the evidence presented at the evidentiary hearing, and also evidence presented at trial, the court makes the following findings of facts and conclusions, to wit:

## FINDINGS OF FACTS

*1.Evidentiary Hearing*

*a. The newly discovered evidence*

At about 10pm on an evening within just a few days of the shooting, Stephanie Vierkant was at the trailer of Robin Cobb to purchase methamphetamine. She had been at the trailer a few minutes when George Peaslee arrived to also purchase drugs. George was crying and appeared upset when he arrived. After entering, George sat down on the couch. Not talking specifically to Veirkant, with his head

in his hands, Veirkant heard George say "I can't believe they arrested my f------

brother for something I did." Veirkant left the trailer a few minutes later after she

obtained her drugs. Other than her mother, Veirkant did not tell anyone about what

she overheard George say.

In July, 2019, after the jury returned its verdict finding Peaslee guilty of murder,

Veirkant was processed at the Cumberland County Jail. In some small talk with the

caseworker while being processed, it came up that Veirkant was from Aroostook

County, which lead to Veirkant inquiring if James Peaslee was in the Cumberland

County Jail. Veirkant then said to the caseworker that Peaslee "..was in jail for

something he didn't do cause someone else told me they did it". The caseworker

promptly relayed this statement to law enforcement, which led to the prompt

disclosure to Peaslee's defense lawyers.

*b. George Peaslee's Mental Health Status and History*

At the time of this hearing, George is being held at the IMHU at the Maine State

Prison. At the IMHU he has been examined and treated by Dr. Bannish on multiple

occasions. Per the testimony of Dr. Bannish, George is bipolar and suffers from

manic psychotic episodes. George has been held at the IMHU on two prior

occasions. Interestingly, one of George's prior presentations to the IMHU was in

3

January, 2018. At all admissions to the IMHU George presented in a manic state, holding delusional and disorganized thoughts. Per Dr. Bannish, George is presently delusional, with disorganized thoughts, is incomprehensible, and is incapable of testifying. Accordingly, the court finds George is unavailable as a witness to provide testimony under oath.

From Dr. Bannish's testimony the court also finds that George has a longstanding mental health condition, in which he cycles through periods of delusional and disorganized thoughts and beliefs, particularly when he is not taking his prescribed medications. His mental health condition is exacerbated by illicit drug use. When cycling through a manic psychotic state, George is not responsive to questions, he cannot stay on track with the conversations, he makes unreliable statements which, as Dr. Bannish stated, will be mixed with grains of truth, and he makes many unusual sexual references . When in a manic psychotic state, it is difficult to sort out from George's statements what is truthful and what is not.

*c. Interviews of George Peaslee*
Viewed during the hearing was the video recording of George's interview conducted by Detectives Anderson and Lindsey the day after the arrest of James Peaslee. The video shows George having a mustache and some facial hair, and

several tattoos on his arms. Although George's appearance observed in the video arguably shares some similarities with James Peaslee, George's overall appearance is distinct from his brother James.

At the commencement of the interview, George appeared calm and even. But when he was told his brother had been arrested for the murder of Paul Hilenski, George became mildly upset, stating he was angry his brother could be going to prison for the rest of his life. He soon told the detectives he had recently been cut-off from his medications, including Suboxone.

Through the course of the interview, George made several statements indicating his dislike for Paul Hilenski. George's dislike stems from his belief Mr. Hilenski mistreated his mother, abused he and his siblings, and that he had cheated them of their mother's insurance and property following her death. As the defense points out, this is the same motive that James Peaslee was alleged to have had. And George told the officers he had he even thought of killing Mr. Hilenski because of his belief that Mr. Hilenski raped his fiancé in the presence of his two-year old son. But throughout the course of the interview, George denied having anything to do with the murder.

As the interview progressed, George repeatedly went off-topic, in rambling sentences non-responsive to the questions posed. Some of his statements were grandiose (*a relative having worked with Neil Armstrong to go to the moon*) and

sensationalizing his own personal strength and physical abilities(*an incident when he threw Mr. Hilenski several feet, working out several hours a day, and an ability to do handstands*). He made several incredulous statements describing his sexual experiences (*sexual acts with numerous ladies*), and also numerous, unrealistic descriptions of genitalia and the effects of sexual abuse to his fiancé(*references to the size of Mr. Helinski's genitals, and description of his fiance's genitalia after the supposed rape*) . Several times George described incidents in which he believed he was being taken advantage of, or cheated by others (*his apartment being broken into and belongings stolen on several occasions*), and that people could read his mind and know what he was thinking before he did ("*I know I'm being app'd*"), leading further to his exploitation. George also said he hears voices.

As previously indicated, the court finds that George is presently unable to testify as a witness due to his mental health condition. The court also finds that some of the symptoms he currently suffers from leading to his inability to testify were also exhibited by him during his his interview in January, 2018, when he had stopped taking his medications and was apparently seeking illicit drugs.

*2. Evidence at Trial*

In addition to the evidence received at the motion hearing, the court takes note of the evidence admitted at trial which the jury had to consider in reaching its guilty verdict. The evidence would support findings by the jury that:

The victim Paul Hilenski was married to Peaslee's mother, Janet, who died in November, 2015 as a result of a car accident. Janet died without a will. As the surviving spouse, Paul received a significant portion of Janet's estate, including the home in Bridgewater. Peaslee was unhappy that Paul received the home. After Janet's death, Paul installed a security system that included video recording of the exterior and interior of the home, including the main entrance to the home.

Paul was killed as a result of gunshot wounds to the chest on January 17, 2018. The shooting was recorded by the security system Paul had recently installed, which showed a man running up the driveway, onto the steps, knocking on the door and then firing multiple shots through the glass of the door. The interior cameras of the system showed Paul walking towards the door, momentarily out of the camera's range, and returning into range with blood showing through his shirt. Several law enforcement officers who knew both James and George Peaslee testified that the individual seen in the recording of the shooting was James

Peaslee. Officers also testified that they recognized the jacket being worn by the shooter in the video recording as a jacket seen worn by Peaslee on several prior occasions. The jury had the opportunity to view the video recordings several times through the course of trial, as well as ongoing opportunity to observe Peaslee. A photograph taken of George Peaslee taken shortly after the shooting was also admitted into evidence for the jury to consider.

Ballistic evidence indicated the bullets that fatally wounded Paul Hilenski were .380 caliber. Spent .380 casings were found at the scene near the area the recording of the security system showed the shooter standing when the shots were fired. The gun used in the shooting was never recovered. But on January 17, 2018, the day of the shooting, Randall Boyce gave Peaslee a .380 caliber handgun in exchange for a TV. And a box of .380 caliber bullets with Peaslee's fingerprints on it was seized by police from Peaslee's home after the shooting.

Cell phone records indicate Peaslee' cell phone was out of service, suggestive it had been turned off, in the timeframe of and after the shooting, which occurred shortly before 6pm. Security footage from On the Run convenience store in Mars Hill showed that Peaslee had entered the store around 4:56 pm the day of the shooting, wearing a different jacket than that seen in shooting video, which the

State theorized was Peaslee's attempt to establish his alibi. An employee of the convenience store testified she recalled seeing Peaslee when he entered the store that day, and he acted differently than usual and was grinding his teeth.

And the jury heard from Matthew Clark, who testified that he spoke with Peaslee in May or June of 2018 while both were in the Aroostook County Jail. Clark testified that Peaslee told him he'd gone to the convenience store to create an alibi, that he acquired a .380 caliber handgun, changed his clothes before going to the Hilenski home, and once there he went to the door, knocked, and when the victim came to the door he shot him. Clark testified that Peaslee further told him that after the shooting, he drove towards Limestone, threw the gun in the woods, put his clothes in a trashbag, washed his hands with bleach, and that he knew about the cameras so covered his tattoos on his arms with cream and clothing. Clark also testified Peaslee told him he shot his stepfather over the property.

## STANDARD OF REVIEW

*1. Newly Discovered Evidence*

Motions for a new trial on the ground of newly discovered evidence are looked upon with disfavor, in light of the need for finality and for the preservation of the

9

integrity of criminal judgments. *State v. Twardus,* 72 A.3d 523, 531 (Me. 2013). A defendant seeking a new trial based on newly discovered evidence must establish by clear and convincing evidence that-

1. the evidence is such as will probably change the result if a new trial is granted;

2. it has been discovered since the trial;

3. it could not have been discovered before the trial by the exercise of due diligence;

4. it is material to the issue; and

5. it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict. *Twargus,* 72 A.3d at 531-532.

The Law Court has described the burden in seeking a new trial based on newly discovered evidence as a heavy one:

> *It is not enough for the defendant to show that there is a possibility or a chance of a different verdict. It must be made to appear that, in light of the overall testimony, new and old, another jury ought to give a different verdict; there must be a probability that a new trial would result in a different verdict.*
> *Twargus,* 72 A.3d at 532; citing *State v. Dechaine,* 630 A.2d 234, 236 (Me. 1993).

This newly discovered evidence identified in Peaslee's motion surfaced after trial, in July, 2019 when Vierkant told to a caseworker at the Cumberland County Jail what she allegedly heard George say in January 2018. This information was

promptly relayed to the investigators and the prosecution, who promptly relayed the information to Peaslee's defense. The Defense concedes, and the court finds there is no *Brady* violation. See *Strickler v. Greene,* 527 U.S. 263, 119 S. Ct. 1936 (1999). Therefore, as will be discussed more fully, *infra,* the primary question is whether the defendant would more likely than not have received a different verdict with the new evidence, and not, had there been a *Brady* violation, whether in the absence of the new evidence the defendant received a fair trial resulting in a verdict worthy of confidence. *State v. Twardus,* 72 A.3d 523, 533 (Me. 2013); citing *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555 (1995).

There is no question that due to his present mental health, George Peaslee is unavailable as a witness to testify under oath. Accordingly, addressing Peaslee's motion requires the additional analysis whether George's statement made in Vierkant's presence is admissible.

*2. Statement Against Interest*

Peaslee argues the Vierkant's testimony to what she overheard George Peaslee state is admissible as a statement against interest pursuant to Rule 804(b)(3). For an out-of-court statement to be admissible pursuant to Rule 804(b)(3):

> 1. the declarant must be unavailable as a witness;

2. the statement must so far tend to subject the declarant to criminal responsibility that a reasonable person in his position would not have made the statement unless he believed it to be true; and

3. the statement must be corroborated by circumstances that clearly indicates its trustworthiness.

*State vs. Cochran,* 2000 ME 78, ¶11.

To satisfy the trustworthiness prong, four additional factors are considered:

1. the time of the declaration and the party to whom it was made;

2. the existence of corroborating evidence in the case;

3. whether the declaration is inherently inconsistent with the accused's guilt; and

4. whether at the time of the incriminating statement the declarant had any probable motive to falsify.

*Cochran,* at ¶12.

The court will first discuss whether George's statement made in Vierkant's presence is admissible, and then discuss whether a new trial be granted.

12

## DISCUSSION

*1. Is George's statement made in Vierkant's presence admissible?*

There is no question that due to his mental health, George is presently unavailable as a witness. The first prong of Rule 804(b)(3) and *Cochran* is satisfied. However, the third prong of Rule 804(b)(3) and *Cochran*, the question of trustworthiness, is doubtful.

Although the statement was made in Veirkant's presence, George was not speaking directly to Veirkant.[1] George arrived at the trailer, to acquire illicit drugs. He had recently stopped taking his prescribed medications. Sitting on the couch, Veirkant described George as upset, crying, and holding his head in his hands when he spontaneously made the statement. The statement was not made in response to any discussions with Vierkant.

Although it is not definitive whether Det. Anderson's interview of George occurred before or after Vierkant's encounter with George, the evidence does establish the two events occurred very close in time, both within a day or so of Peaslee's arrest. George's condition observed in the video recording of his

---

[1] A statement made in response to a question or part of a conversation is deemed more reliable and trustworthy than a statement made to oneself, or not part of a direct conversation with another.

interview is indicative of his condition when Vierkant encountered him. As previously discussed, at the time of the interview, George repeatedly went off topic, and was non-responsive to the questions posed; he made grandiose statements of a relative's accomplishments and of his own strength and abilities and sexual experiences; and he expressed unrealistic descriptions of genitalia, particularly regarding his fiancé. With the assistance of Dr. Bannish's testimony which explain George's diagnoses, mental health history and description of his delusional and disorganized beliefs when suffering from a manic psychotic period, coupled with his being off his medications and seeking illicit drugs at that time, the court believes some level of manic psychosis was present during the interview. The interview and the encounter with Vierkant occurring close in time, the court also finds it likely George was suffering some degree of manic psychosis during his encounter with Vierkant when George was seeking drugs. Observing George's condition during his interview with Det. Anderson, the court cannot find a statement made by him within the same timeframe, while upset, crying, and seeking drugs, to be trustworthy. The court finds that the requirements of Rule 804(b)(3) and the *Cochran* factors for trustworthiness are not satisfied.[2]

---

[2] The same reasoning calls into question whether the second prong of Rule 804(b)(3) is capable of being satisfied, as George's mental health condition would impair his ability to act as a reasonable person would.

Accordingly, the court finds that George's statement made within Vierkant's presence is not admissible.

To complete the discussion however, the court will assume *arguendo* the statement made in Vierkant's presence is admissible.

*2. Should the newly discovered evidence entitle Peaslee to a new trial?*

The statement Vierkant overheard George make was not revealed to law enforcement until after trial, so was obviously not discovered until then. Short of interviewing everyone in Aroostook County, it would have been impossible to discover before. The statement, if admissible, would be material, and was not merely cumulative or impeaching. Accordingly, the last four factors of the factors listed in *Twardus* for a new trial based on newly discovered evidence are satisfied. See *State v. Twardus*, 72 A.3d 531-532. The pivotal question is whether Peaslee has established by clear and convincing evidence that the evidence is such as will *probably* change the result if a new trial is granted. *State v. Twardus*, 72 A.3d at 531. The answer to that question is no.

A theme generated by the defense through trial was that it could have been George Peaslee that committed the murder, and it was George who is seen in the surveillance video of the shooting. Through the trial, the defense asserted that it was not James Peaslee who is seen doing the shooting. In addition to the videp of the shooting, and having an opportunity to view Peaslee himself, the jury was also provided a photograph of George taken shortly after the murder. In short, the jury had the benefit of watching the surveillance video several times, looking at the photograph of George, and making its own observations of James Peaslee to reach its conclusion whether James Peaslee was the shooter seen in the video. And as previously stated, although they have some similarities, George looks quite distinct from James. James Peaslee did not have a mustache, while George did. Although the video was not "movie" quality, it was clear enough to make reasonable conclusions whether the individual was James Peaslee or George. In short, the video of the shooting was compelling evidence of James Peaslee's guilt.

But there was significant additional evidence. The murder weapon was a .380 caliber handgun. Although the murder weapon was not recovered, the evidence showed Peaslee acquired a .380 shortly before the murder, and a box of .380 caliber bullets with his fingerprints were found in his home. And Peaslee confessed to Matthew Clark that he committed the crime over the dispute involving his

mother's property, that he had acquired a .380 caliber gun, gone to a convenience store to create an alibi, changed clothes, then went to the Hilenski home, knocked on the door and when Hilenski came to the door he shot them. He also told Clark he had gotten rid of his clothes and gun. Security camera footage showed Peaslee did go to a convenience store shortly before the murder, in a jacket different than seen in the shooting video. But the jacket worn by the shooter in the video was a jacket that officers testified to seeing Peaslee wear on several prior occasions. Point being, Matthew Clark had numerous details of the murder consistent with the evidence of the case, supportive of the view he obtained the information first hand, and that Peaslee was attempting to create an alibi. And conveniently, the evidence showed Peaslee's cell phone was off during the time frame of the murder, consistent with an attempt to conceal his locations.

The evidence the jury had to consider was extremely compelling of Peaslee's guilt. The newly discovered evidence pales in comparison. If the jury had been presented with Vierkant's testimony of what she overheard George say, they would have also been considering that it was something said while George was described as upset, crying, and seeking drugs- testimony coming from someone seeking drugs herself, who didn't relay the information until over a year late while entering a jail. And were the jury to have received Veirkant's testimony, the jury most likely would

have also seen the video of George's interview to Det. Anderson. In that video, they would not just have seen George deny involvement, but also been able to make their own assessments as to how reliable or credible anything is that George says and whether he is grounded in reality.

Again, the magnitude of evidence demonstrating Peaslee's guilt is significant. If the evidence of what Veirkant overheard George say while both of them were getting drugs was admitted at trial and presented to the jury, the court finds it would not change the result. See *State v. Dobbins*, 2019 ME 116, ¶50. The court finds that Peaslee has not established by clear and convincing evidence that such evidence from Veirkant will probably change the result if a new trial was granted. Again, the standard is not that whether there is a *possibility* or a chance of a different verdict; there must be a *probability* that a new trial would result in a different verdict. *State v. Twardus*, 72 A.3d at 532.

Accordingly, Peaslee's motion for a new trial is denied.

Dated: November ___, 2019

Justice, Superior Court