STATE OF MAINE                          SUPERIOR COURT
ANDROSCOGGIN, ss.                       CRIMINAL ACTION
                                        DOCKET NO. CR-13-458

RECEIVED & FILED

JUN 0 9 2016

ANDROSCOGGIN
SUPERIOR COURT

STATE OF MAINE,                )
                               )
v.                             )        ORDER ON DEFENDANT'S
                               )        MOTIONS FOR NEW TRIAL
                               )
MICHAEL M. McNAUGHTON,         )
                               )
           Defendant           )

This matter is before the court on Defendant Michael McNaughton's motions for new trial. The Defendant asserts three grounds for a new trial: newly discovered evidence received from the State following the jury verdict, failure of the State to turn over text messages prior to trial, and a denial of due process by the introduction of "perjured testimony" by State witnesses and inconsistent theories of prosecution.

I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

On April 12, 2013 a complaint was filed against Michael McNaughton for intentionally or knowingly causing the death of Romeo Parent on April 9, 2013. On May 8, 2013, Michael McNaughton was indicted on one count of intentional or knowing murder or depraved indifference murder in violation of 17-A M.R.S. §201 (1)(A) & (B), one count of conspiracy to commit intentional murder, in violation of 17-A M.R.S. §151(1)(A), and one count hindering apprehension or prosecution, in violation of 17-A M.R.S. §753(1-B)(C)(1).[1] On July 28, 2014, following 11 days of trial and two days of jury deliberations, Michael McNaughton was found guilty of all charges.

The court acknowledges and regrets that it has taken significantly longer to rule on Defendant's motions for new trial than is normally preferred or

---

[1] Nathan Morton and William True were also indicted on May 8, 2013. Nathan Morton was indicted on the same charges as Michael McNaughton; and, William True was indicted on a single charge of hindering apprehension or prosecution. William True was subsequently indicted on July 8, 2014, on one count of intentional or knowing or depraved indifference murder, one count of conspiracy to commit intentional murder, and, one count of hindering apprehension or prosecution. The original indictment against William True was dismissed.

1

expected. There are myriad reasons for the delay, not the least of which is the courts and counsels' schedules. The overriding cause for the delay, however, was counsels' express preference to await the outcome of the trial and subsequent motions in the case against William True. The True trial began on December 3, 2014 and lasted 11 days. On December 17, 2014, the jury found William True guilty of one count of intentional or knowing or depraved indifference murder and one count of hindering apprehension or prosecution.[2] Defendant William True filed motions for new trial, asserting many of the same, albeit some unique concerns as the Defendant filed in this case. (See: Fn.3). After numerous conferences, hearings and months of accusations among counsel, William True accepted the State's sentencing recommendation and was sentenced by the court on December 3, 2015.

Michael McNaughton's first motion for new trial was filed on August 20, 2014. He claimed that he was deprived of a fair trial based on newly discovered evidence. While acknowledging that he had seen some of the evidence during the trial, he asserted that there were two pieces of significant evidence that he received on August 19, 2014 – 22 days after the jury verdict. That evidence consisted of a CD recording of an interview of William True on April 5, 2013, just four days before the murder of Romeo Parent, which related to the criminal charges for which Mr. Parent had implicated Mr. True.[3] There was also a report and CD regarding a phone call placed by Jessica Gaudette to Felicia Cadman, in

---

[2] The lead prosecutor was the same in both cases. Much of the testimony presented in the McNaughton and True trials was inextricably intertwined, particularly that of Nathan Morton, who entered into a plea agreement and agreed to cooperate with the State on June 25, 2014. Morton's testimony, as well as statements he allegedly made while incarcerated at the Androscoggin County Jail, was a source of constant disagreement. There were ongoing disputes regarding the State's production evidence, including claims of *Brady/Giglio* violations. As late as October 2015, there were discovery motions and arguments regarding the evidence to be presented at the hearing on William True's motion for new trial. The wrangling and accusations among counsel went unabated until William True determined to withdraw his motion for new trial.

[3] The State presented evidence that William True and Romeo Parent were involved in a burglary on April 4, 2013, less than a week prior to Romeo's murder on April 9, 2013. When interviewed about the burglary, Romeo Parent implicated William True, who was arrested on April 6, 2013, taken to the Androscoggin County Jail and released after the weekend. There was evidence that Romeo was murdered because he was a "snitch." The burglary investigation was ongoing at the time of Romeo's murder.

2

which Cadman "apparently admits that she had basically been lying about William True being in the woods on the night of the murder."

On October 21, 2014, Defendant filed an amended or second motion for new trial and motion for sanctions. In addition to the claims initially asserted, Defendant added a claim relating to more newly discovered evidence – a video recording of an interview with Felicia Cadman and accompanying written report, from her arrest on July 10, 2014. Defendant received this evidence on October 20, 2014, almost three months after the trial concluded. Defendant also claimed a due process violation based on the State's failure to turn over text messages allegedly sent between the detectives and witnesses in the case. A testimonial hearing on Defendant's motions for new trial was scheduled for February 24, 2015.[4] During the hearing, Defendant advised that he intended to further amend his motion for new trial by including a claim that the State presented "perjured testimony" at his trial. At the end of the hearing day, the matter was scheduled for further testimony on April 1, 2015.

On March 10, 2015, Defendant filed his second amended or third motion for new trial. In addition to the allegations raised in his prior motions, Defendant claimed that his due process rights were violated by the State's presentation of inconsistent theories of the murder in Defendant's trial and that of William True.

In considering Defendant's motions for new trial, the court has reviewed the file in this matter, including but not limited to: Defendant's motions and argument, the State's opposition briefs, hearing transcripts and the court's notes from hearings held on February 24, 2015 and April 1, 2015. The court has also reviewed the exhibits Defendant asserts he did not receive until August 19, 2014: A CD recording of an interview with William True on April 5, 2013 and a written report and transcript of a pre-text call placed by Jessica Gaudette to Felicia Cadman on July 2, 2014; and exhibits not received until October 20, 2014: A report regarding Detective Wayne Clifford's interview with Felicia Cadman on the day of her arrest, July 10, 2014 (the CD of this interview was played at the hearing on February 24, 2015.) In addition, the court has reviewed other exhibits, including but not limited to: The Incident Report regarding the burglary on April

---

[4] Prior to this, there had been discussion about scheduling Michael McNaughton's sentencing on April 1, 2015, during the court's administrative week.

4, 2013 that Romeo Parent and William True were alleged to have committed. The transcript of an interview of Felicia Cadman on May 17, 2013 by Detectives Michael Chavez and Randall Keaten; and, transcripts of interviews of Felicia Cadman and Jessica Gaudette on June 30, 2014 by Detectives Randall Keaten and Roland Godbout.

## II. DISCUSSION

Underlying the Defendant's motions for new trial is the assertion that the State has failed to provide discovery in accordance with Rule 16 of the Maine Rules of Criminal Procedure (M.R.Crim.P.).[5] In addition to seeking a new trial, Defendant asks the court to sanction the State for failing to provide discovery, presenting perjured testimony and proceeding on inconsistent theories in Defendant's case and that of William True's.

In addition to promoting the requirement of constitutional due process, Rule 16 of the M.R.Crim.P. functions to enhance a defendant's opportunity to prepare for trial, and to diminish the element of unfair surprise. By equalizing, as between the State and the accused, access to materials that the defendant could not easily obtain elsewhere, the outcome of a criminal prosecution hinges on the merits of the case rather than on the demerits of lawyer performance on one side or the other. See State v. Ledger, 444 A.2d 404, 410 (Me. 1982) citing: State v. Eldridge, 412 A.2d 62, 67 (Me. 1980); Brady v. Maryland, 373 U.S. 83 (1963); State v. Morton, 397 A.2d 171, 176 (Me. 1979); and, State v. Thurlow, 414 A.2d 1241, 1244 (Me. 1980).

The duty on the State to disclose information is a continuing one. M.R. Crim. P. 16(a)(2). However, the duty of the State to provide discovery is not an absolute one. The State's duty is one of reasonable diligence, of making reasonable inquiry to uncover material relevant to the case against the defendant. See State v. Dowling, 435 A.2d 496, 499-500 (Me. 1982); See also State v. Simmons, 435 A.2d 1090, 1093 (Me. 1981). The State is not required to perform investigatory work for the defendant, nor to locate and make available to the defendant all

---

[5] On July 1, 2015, the Maine Rules of Unified Criminal Procedure (M.R.U.Crim.P.) were enacted statewide and replaced the Maine Rules of Criminal Procedure (M.R.Crim.P.). At the time this case was prosecuted, the M.R.Crim.P. were still in effect and are applicable to this matter.

4

material about the defendant regardless of its relevancy to the case or likelihood of its use at a trial or pretrial proceeding. See State v. Morton, 397 A.2d 171, 176 (Me. 1979).

Rule 33 M.R.Crim.P. governs motions for a new trial. On motion of the defendant, a court may grant a new trial to the defendant if required in the interest of justice. M.R.Crim.P. 33. "A motion for a new trial based on any ground other than newly discovered evidence shall be made within 10 days after verdict or finding of guilty or within such time as the court may fix during the 10-day period." M.R.Crim.P. 33.

"Motions for a new trial on the ground of newly discovered evidence are looked upon with 'disfavor,' in light of the need for finality and for the preservation of the integrity of criminal judgments." State v. Twardus, 2013 ME 74, ¶29, 72 A.3d 523. "Any motion for a new trial based on the ground of newly discovered evidence may be made only before, or within 2 years after, entry of the judgment in the criminal docket." M.R.Crim.P. 33. Under Rule 33, "a defendant seeking a new trial based on newly discovered evidence must establish by clear and convincing evidence that:

(1) The evidence is such as will probably change the result if a new trial is granted;

(2) It has been discovered since the trial;

(3) It could not have been discovered before the trial by the exercise of due diligence;

(4) It is material to the issue; and

(5) It is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

The defendant's burden "is a heavy one:

> It is not enough for the defendant to show that there is a possibility or a chance of different verdict. [I]t must be made to appear that, in the light of the overall testimony, new and old, another jury ought to give a different verdict; there must be a *probability* that a new trial would result in a different verdict."

5

Twardus, 2013 ME 74, ¶30, 72 A.3d 523 (emphasis in the original) (citations omitted). Where the newly discovered evidence is merely impeaching, the standard is higher by requiring a showing of a "nearly certain change in result." Id. The trial court determines the weight and credibility of the newly discovered evidence. Id. (citations omitted).

When the defendant alleges a violation under Brady v. Maryland, 373 U.S. 83 (1963), "[a] somewhat less stringent standard applies" than the standard applied by M.R.Crim.P. 33. The defendant nevertheless retains the burden of proof and the trial court determines the weight and credibility of the newly discovered evidence. Twardus, 2013 ME 74, ¶31, 72 A.3d 523 (citations omitted).

The Supreme Court has identified three elements of a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Twardus, 2013 ME 74, ¶31, 72 A.3d 523 (citing Strickler v. Green, 527 U.S. 263, 281-282 (1999)).

The element of prejudice is satisfied if the undisclosed evidence is material. Twardus, 2013 ME 74, ¶32, 72 A.3d 523. Material means, "The nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. Id. (citing Strickler, 527 U.S. at 281-82 and State v. Silva, 2012 ME 120, ¶10, 56 A.3d 1230). A "reasonable probability" of a different result exists where "the government's evidentiary suppression undermines the confidence in the outcome of the trial." Id. ¶31 (citations omitted). Another way to describe materiality is: "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. ¶33 (citations omitted). The materiality of undisclosed evidence is considered collectively. Twardus, 2013 ME 74, ¶31, 72 A.3d 523.

In determining whether to apply M.R.Crim.P. 33 or the Brady standard, the court looks at whether the State suppressed the evidence and whether the evidence existed at the time of trial. See Twardus, 2013 ME 74, ¶¶34, 41, 46-48, 72 A.3d 523. If the State did not suppress evidence, then the court applies the

6

standard under M.R.Crim.P. 33. Twardus, 2013 ME 74, ¶¶41, 48, 72 A.3d 523. If the State suppresses evidence that existed at the time of trial, then the court applies the standard under Brady. See Twardus, 2013 ME 74, ¶34, 72 A.3d 523 (emphasis in the original) (citations omitted). If the State suppresses evidence that did not exist at the time of trial, then "a defendant is left with an argument that the prosecutor's non-disclosure amounted to conduct contrary to fundamental notions of fair play and that defendant was deprived of a fair trial." Id. ¶¶31, 46. If the defendant makes such an argument, the trial court evaluates it by applying the Rule 33 standard. See Id. ¶¶ 46-47.

In accordance with the foregoing, the court reviews each of Defendant's claims for new trial.


1. Newly discovered evidence received from the State following the jury verdict.

In his first motion for new trial, filed on August 20, 2014, Michael McNaughton claims he was deprived of a fair trial based on newly discovered evidence. He asserts that on August 19, 2014, – 22 days after jury verdict – he received two pieces of significant evidence on which his first motion for new trial is predicated. That evidence consisted of a CD recording of an interview of William True on April 5, 2013, which related to the criminal charges for which Mr. Parent had implicated Mr. True. There was also a report and CD regarding a phone call placed by Jessica Gaudette to Felicia Cadman, in which Felicia "apparently admits that she had basically been lying about William True being in the woods on the night of the murder."


*a) The CD recording of an interview of William True on April 5, 2013.*

The State's witness, Eric Syphers, of the Lewiston Police Department, testified on July 9, 2014 that he investigated the theft in which Romeo Parent and William True were implicated. He testified that he interviewed Romeo Parent and, subsequently he interviewed William True. Both Parent and True admitted their involvement in the theft but only William True was arrested. The Incident Report (Bates Stamped P1707 to P1726) was made available to the Defendant. On

7

P1725, there is a reference to "1 Disc." The disc was not turned over to the State and was not turned over to Defendant until August 19, 2014.

Although the State had a copy of the Incident Report, which if read carefully placed them on notice that there was a disc, the State avers that it did not know of the existence of the disc and certainly would have provided it had it known.

If the court accepts the State's assertion that it did not know about the recorded interview, Defendant cannot meet his burden under M.R.Crim.P. 33. First, the reference to "1 Disc" in the Incident Report, casts serious doubt that the evidence was actually discovered *after* the trial. Second, both the State and Defendant had copies of the Incident Report. Had either side exercised due diligence, the disc could have been discovered before the trial. And third, the court finds that the evidence itself – a recording of William True's interview about the theft – was not material to Defendant's case and would not have changed the result if a new trial were granted.

If the court does not accept the State's assertion that it did not know about the recorded interview and applies the "somewhat less stringent standard" under Brady, Defendant still cannot meet his burden of proof. The absence of the disc simply does not impact the fairness of the trial nor does it cast doubt on the verdict.

Notwithstanding the above, the court finds, in accordance M.R.Crim.P. 16(b)(2), that it was incumbent upon the State to have requested the "1 Disc" referenced in the Incident Report. The State failed to exercise "reasonable diligence" in determining whether the Lewiston Police Department, an agency that reported to it in the case, had discoverable material. (See State v. Robbins, 1997 ME 21, ¶ 7, 689 A.2d 603).


*b) The report and CD regarding a phone call placed by Jessica Gaudette to Felicia Cadman.*

Defendant claims that he was deprived of a fair trial based on newly discovered evidence of a report and CD regarding a phone call placed by Jessica Gaudette to Felicia Cadman, in which Cadman "apparently admits that she had

8

basically been lying about William True being in the woods on the night of the murder."

The State acknowledges that the recorded phone call to Felicia Cadman from Jessica Gaudette was not provided in discovery because "it was made in connection with a separate investigation in another case with no apparent bearing on this Defendant's guilt or innocence."

From the evidence presented, it is clear that the investigation into Romeo Parent's murder evolved over time. In the early days of the investigation, law enforcement was receiving and obtaining information from numerous sources. Interviews were being conducted simultaneously in separate rooms at the Lewiston Police Department and sometimes in different locations. Law enforcement was investigating Defendant, William True, Nathan Morton, Felicia Cadman, and others. It is fair to say that the investigation was producing new information at a rapid pace.

At first, law enforcement was focused on William True. Shortly thereafter, however, the statements they received from many different sources changed their focus to Defendant, who was arrested and subsequently indicted. Just prior to the start of Defendant's trial, Nathan Morton accepted a plea offer and began to cooperate with law enforcement. Based in large part on Morton's testimony, William True was indicted on the same charges as Defendant.

The investigation of William True also turned the spotlight onto Felicia Cadman, who was William True's girlfriend at the time of Romeo's death. According to the State, the recorded phone call to Felicia from Jessica Gaudette, "a pretext call," was part of the investigation into William True's involvement in the murder.

The court has reviewed the content of the phone call placed by Jessica Gaudette to Felicia Cadman, as well as the testimony given by Jessica Gaudette at Defendant's trial. The court finds that the phone call was not material to any issue regarding Michael McNaughton's guilt or innocence. The court also finds that any impeachment value that the phone call might have had, was cumulative. The court finds further that even if the phone call had been presented at trial, it is highly unlikely that it would have had an impact on the outcome of the trial.

9

Therefore, the court concludes there was no prejudice to Defendant by not having access to the phone call.

The court concludes that the State's determination that the phone call evidence was not material to Defendant's case was reasonable under the circumstances and was not a violation of their responsibilities under Rule 16 of the M.R.Crim.P. or pursuant Brady.

*c) The video and accompanying written report of the interview of Felicia Cadman at the time of her arrest on July 10, 2015.*

In his amended or second motion for new trial and motion for sanctions, Defendant added a claim relating to more newly discovered evidence - a video recording and accompanying written report of the interview of Felicia Cadman at the time of her arrest on July 10, 2014. Defendant received this evidence on October 20, 2014, almost three months after the trial concluded.

As previously stated, the Supreme Court has identified three elements of a Brady violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Twardus, 2013 ME 74, ¶31, 72 A.3d 523 (citing Strickler v. Green, 527 U.S. 263, 281-282 (1999)).

The element of prejudice is satisfied if the undisclosed evidence is material. Twardus, 2013 ME 74, ¶32, 72 A.3d 523. Material means: "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. Id. (citing Strickler, 527 U.S. at 281-82 and State v. Silva, 2012 ME 120, ¶10, 56 A.3d 1230). A "reasonable probability" of a different result exists where "the government's evidentiary suppression undermines the confidence in the outcome of the trial." Id. ¶31 (citations omitted). The materiality of undisclosed evidence is considered collectively. Twardus, 2013 ME 74, ¶31, 72 A.3d 523.

After reviewing the video and reading the report, the court finds, in accordance M.R.Crim.P. 16(b)(2), that it was incumbent upon the State to have secured the video recording and accompanying written report and that the State had a duty to provide it to Defendant. The State failed to exercise "reasonable diligence" in determining whether the Lewiston Police Department, an agency

that reported to it in the case had discoverable material. (See State v. Robbins, 1997 ME 21, ¶ 7, 689 A.2d 603).

The breakdown in procedure began when Detective Clifford put the video recording of his interview with Felicia Cadman after her arrest in his desk drawer. The breakdown continued when Detective Keaten failed to follow up with Detective Clifford after asking him to arrest Ms. Cadman and interview her, "if he'd be willing." The final breakdown occurred when the State's attorneys, knowing that Felicia Cadman had been arrested, did not inquire if there was a report and/or video. The report and video was favorable to the accused, because it was impeaching. The State should have provided it to the Defendant but did not.

That said, when the court views the failure of the State to provide Defendant with the video recording and accompanying written report of the interview of Felicia Cadman upon her arrest, it cannot say, even under the "somewhat less stringent standard" of Brady, that the State's evidentiary suppression undermines the confidence in the outcome of the trial. The court finds that even if the suppressed evidence had been produced, there is no reasonable probability that it would have produced a different verdict.

Despite the State's failure to provide the Defendant with this favorable, impeaching evidence, there was an abundance of favorable evidence that the Defendant received and used for impeachment purposes. As the result, the court finds that no prejudice ensued.

The court has considered the cumulative impact of the undisclosed evidence in terms of whether it is material and, as such, undermines the confidence in the outcome of Defendant's trial. The court finds that the State's failure to provide the CD recording of William True's interview at the time he was arrested for burglary and the State's failure to provide the video recording of Felicia Cadman's interview at the time of her arrest and the subsequent written report, while not in compliance with the rules, does not rise to the level of prejudice necessary to call into question the outcome of the trial. The court does not find sanctions necessary on this occasion and declines to impose any.

11

2. <u>State's failure to turn over text messages allegedly sent between the detectives and witnesses in the case.</u>

In his amended or second motion for new trial, Defendant claims a due process violation based on the State's failure to turn over text messages allegedly sent between the detectives and witnesses in the case. As pointed out by the State, the Defendant was aware of the possibility of text messages during the trial and did not request that they be provided to him. The court finds this is not new evidence and Defendant's argument is therefore time barred.

3. <u>The State presented "perjured testimony" at his trial and also presented inconsistent theories of the murder in Defendant's trial and that of William True's.</u>

At the testimonial hearing on Defendant's motions for new trial held on February 24, 2015, Defendant advised that he intended to further amend his motion for new trial by including a claim that the State presented "perjured testimony" at his trial. On March 10, 2015, Defendant filed his second amended or third motion for new trial. In addition to the allegations raised in his prior motions, Defendant also claimed that his due process rights were violated by the State's presentation of inconsistent theories of the murder in Defendant's trial and that of William True.

a) *State's presentation of "Perjured testimony"*

Defendant asserts that "[t]he State either introduced [] perjured testimony or it said nothing when such testimony occurred." This is an extremely serious accusation. It is also, regrettably, another example in the litany of prosecutorial misconduct indictments levied against the State.

The United States Supreme Court has emphasized: "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209 (1982). "No right ranks higher than the right of the accused to a fair trial," a tenet reinforced by Maine's Chief Justice in State of Maine v. Kenneth Frisbee, 2016 ME 83, ¶¶16, 19 (citing Press-Enter. Co. v. Superior Court of Cal., 464 U.S. 501, 508

12

(1984)). A finding that the State used perjured testimony or said nothing when such testimony occurred would be a fundamental due process violation. State v. Cormier, 535 A.2d 913, 916 (1987).

To rule on whether Defendant is entitled to a new trial based on the accusation that the State used perjured testimony or failed to disclose such testimony when it occurred, this court must first determine that a colorable claim exists that the government used perjured testimony. Gonzalez-Gonzales, 258 F.3d 16, 22 n.1 (1st Cir. 2001); State v. Cormier, 535 A.2d 913, 916 (1987) (finding that the testimony of a State witness did not rise to the level of being knowingly perjured, so the court applied the test that is mirrored in M.R. Crim. P. 33).

In support of his claim, Defendant points to the testimony of several witnesses, "most notably" the testimony of [Nathan] Morton, who admitted on several occasions that he had been less than truthful with the police on numerous occasions, changing his story repeatedly to suit the situation..."

Defendant is correct that these claims are time barred by M.R.Crim.P. 33. Nevertheless, the court in an abundance of caution has reviewed those portions of the testimony that Defendant cites in support of his claim. The court has also read the extensive and thorough cross-examination of these witnesses that was conducted by Defendant's attorney.

With specific reference to Nathan Morton, Defendant's attorney painstakingly questioned him regarding every version of events that Mr. Morton gave during the course of the investigation leading up to and including his testimony at Defendant's trial, after entering into his agreement with the State. Based on that review, the court finds that the State neither presented perjured testimony nor said nothing when such testimony occurred, despite Defendant's assertions to the contrary.

As evidenced at trial, the individuals who came forward or were sought out by law enforcement, were mostly a group of young people who slept until noon or later; engaged in minor thefts to obtain money for drugs; used drugs throughout their waking hours; and, lived by an unwritten code not to "rat" or "snitch" on each other. The phrase "snitches get stiches" was advanced by many of the State's witnesses. Over the course of the investigation many, if not all of

13

the witnesses gave varied accounts of their involvement and knowledge of the circumstances surrounding Romeo Parent's death. This evidence was presented by the State and challenged by Defendant.

At the conclusion of the evidence and after closing arguments, the jury was instructed regarding their obligation to determine the credibility or believability of the witnesses. They were given suggestions as to how they might go about that task, including:

- You may want to consider the witness's age, experience and intelligence.

- You may want to think about the way in which the witness testified on the stand; and evaluate whether that witness was forthright or evasive.

- You can consider whether the witness's testimony made sense or how well the witness explained any prior inconsistent statement.

- The testimony of a witness may be discredited or impeached by evidence that the witness previously made statements that are not consistent with present testimony. Such statements are admitted in evidence solely on the issue of believability of the witness.

- You can consider whether a witness's testimony was corroborated or contradicted by other testimony or by exhibits.

- You can consider how well each witness has remembered what took place and how good an opportunity the witnesses had to make the observations that he or she says were made.

- Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses may or may not, cause you to question such testimony. Two or more persons witnessing an incident or a transaction may see or hear it differently; and innocent miss-recollection, like failure of recollection, sometimes happens. In weighing the effect of any discrepancy, always consider whether it relates to an important issue or an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

- You can also consider whether there has been any evidence of a motive or lack of motive for a witness to exaggerate or to lie.
- Finally, you can consider what interest, if any, each witness may have in the outcome of this case.

The jury was also instructed that:

"This is not a complete list of the tests you can use, but it is the type of process that you may go through in deciding how much credibility to assign to the testimony of each witness.

You may decide that you want to believe everything that a particular witness has said. You may decide that you don't want to believe anything that a witness has said. You may choose to believe some aspects of a witness's testimony and reject the remaining aspects of that witness's testimony. This is entirely up to you.

A case is not decided according to which side presents more witnesses. The testimony of a single witness is sufficient to prove any fact, and would justify a verdict in accordance with such testimony, even if a number of witnesses may have testified to the contrary if, after consideration of all the evidence, you believe that the single witness is more accurate or more truthful.

Ultimately remember, in addition to deciding what evidence is credible, you have to decide whether there is sufficient evidence-meaning enough evidence to satisfy you that the State has proven the charge against the Defendant beyond a reasonable doubt."

The court is satisfied that the jury understood the court's instructions and performed their duty.

*b. The State presented inconsistent theories in Defendant's trial and William True's trial.*

Defendant's last argument in support of his motion for a new trial is that the State presented "inconsistent theories of the murder in Defendant's trial and that of William True." Having presided over both trials, and having reviewed Defendant's argument, the court finds that the State did not present inconsistent or irreconcilable theories in Defendants trial and that of William True. It was

clear in both trials that the State's theory was that both Defendant and Mr. True were with Romeo Parent, in the woods in Greene on April 9, 2013. Both Defendant and Mr. True participated, either as a principle or an accomplice, in Romeo Parent's murder. The State's theory did not waiver. It was neither inconsistent nor irreconcilable.

In accordance with the forgoing, the court DENIES Defendant's motions for new trial.

The Clerk is directed to incorporate this Order by reference on the docket pursuant to M.R.Crim.P. 53(a).

Dated: June 9, 2016

MaryGay Kennedy, Justice
Maine Superior Court